UNTIED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

H & M PETRO MART, INC.,

        Plaintiff,

CASE NO. 11-13140

v.

HON. MARIANNE O. BATTANI

ZURICH AMERICAN INSURANCE
COMPANY

        Defendant.
_____/

**OPINION AND ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on Defendant Zurich American Insurance Company's Motion for Summary Judgment against Plaintiff H & M Petro Mart for costs incurred in cleaning up a release of contaminants from an underground gasoline storage tank. (Doc. 18). The Court heard oral argument on the motions on November 8, 2012, and at the conclusion of the hearing took the matter under advisement. For the reasons that follow, Defendant's motion is **GRANTED**.

**I.    STATEMENT OF FACTS**

H & M Petro Mart entered into an insurance agreement with Zurich American Insurance Company for a "Storage Tank System Third Party Liability and Cleanup Policy" effective from December 11, 2008 to December 11, 2009 (hereinafter "the Policy"). (Doc. 18 Ex. A). The Policy contains a retroactive date of December 11, 2000, and covered Plaintiff's premises located in Detroit, which included four underground storage tank systems. (Id.) It required Zurich to pay on behalf of H & M "cleanup costs"

required by governmental regulation resulting from a "release" of contaminants into the ground from the scheduled storage tank systems.  (Id. at § I.A)  The Policy defined "scheduled storage tank system(s)" as a "tank . . . including any connected piping, ancillary equipment and containment system that is on, within, or under a 'scheduled location.'"  (Id. at § II.R).

The Policy defines "cleanup costs" as "the necessary expenses incurred in the investigation, removal, remediation, neutralization or immobilization of contaminated soil, surface water, groundwater, or other contamination."  (Id. at § II.F.1).  "[A]ny costs, charges or expenses incurred by the 'insured' to confirm the existence of a 'release' under Coverage A shall not be considered 'cleanup costs.'"  (Id.)  The Policy also contains "Exclusion L," which provides in relevant part:

> This insurance does not apply to "claim(s)", "cleanup costs" or "loss(es)" based upon or arising out of:
>
> L. any costs for the reconstruction, repair, removal, maintenance, replacement, upgrading, or rebuilding of any "scheduled storage tank system", personal property, fixtures, buildings, or any other improvements and any site enhancement or routine maintenance on, within, or under the "schedule location(s)"[.]

(Id. at § IV.L).

On April 15, 2009, H & M discovered a "release" of contaminants at its premises (hereinafter "the 2009 Release").  H & M reported the 2009 Release to Zurich.  (Doc. 18 Ex. C).  Zurich responded by letter reserving its rights, but ultimately paid over $190,000 in costs relating to the remediation of the contaminated environment.  (Doc. 18 Ex. F, p.56).

In 2010, H & M submitted two additional invoices to Zurich requesting payment.  (Doc. 18 Exs. G, H).  The first invoice, from Metro Tank, Inc., was for installation of new

product lines, electrical wire and conduits, sewer system and canopy drain, dispenser islands and bumper guards, and re-installation and calibration of dispensers.  Much of these services involved replacing and reinstalling the gas pumps above the surface of the scheduled location along with calibrating the pumps and reforming the bumpers the dispensers rest upon.  The invoice totaled $53,950.00.  The second invoice, from Patrick Johnson, Inc., was for replacement of 5,800 square feet of concrete above the surface of the scheduled location where the pumps rest and consumers drive upon to reach the dispenser islands.  The invoice totaled $23,200.00.

   Zurich submitted the two invoices to VERTEX, its underground storage tank expert, which reviewed whether Zurich should pay for the services.  (Doc. 18 Ex. I). VERTEX determined the services related to site enhancement, re-installation of items, and replacement of items not associated with Michigan Department of Natural Resources ("MDNR") required remedial activity.  (Id. at 2 of 3).  However, it did find that Zurich was required to pay $2,250 for backfill of remedial excavation.  With the exception of $2,250, Zurich notified H & M of its intention to deny the costs citing Exclusion L and asserted the services were not "reasonable and necessary cleanup costs" covered under the Policy. (Doc. 18 Ex. K).

   On August 30, 2010, H & M's counsel requested Zurich reconsider its determination.  Zurich then requested VERTEX to reconsider its report and analysis. (Doc. 18 Ex. J).  After VERTEX affirmed its analysis, Zurich ultimately affirmed its position, and refused to pay for the services.  Thus, H & M filed the instant action to compel Zurich to pay the remaining $74,900 due under the invoices (hereinafter "the Unpaid Costs"), asserting the Policy provided coverage for those costs.

H & M admits the contamination at its premises is fully remediated, and no further work is required. (Doc. 18 Ex. N). The premises received a "closed" designation from the Michigan Department of Environmental Quality ("MDEQ"). (Id.) Whether Zurich must pay the Unpaid Costs is the only issue in dispute.

## II. STANDARD OF REVIEW

Summary judgment is appropriate only when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, (1986). Rule 56 mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. Once the moving party meets this burden, the non-movant must come forward with specific facts supported by affidavits or other appropriate evidence establishing a genuine issue for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Fed. R. Civ. P. 56(c)(1)(A). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). The Court "must lend credence" to the non-moving party's interpretation of the disputed facts. Marvin v. City of Taylor, 509 F.3d 234, 238 (6th Cir. 2007) (citing Scott v. Harris, 127 S.Ct. 1769, 1775 (2007)). The mere existence of a scintilla of

4

evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. Hopson v.DaimlerChrysler Corp., 306 F.3d 427, 432 (6th Cir. 2002).

### III. ANALYSIS

H & M argues it is entitled to the Unpaid Costs because they are "necessary" under the Policy in order to clean up and remediate the contamination. In order to remediate the area, the concrete must be torn up and the tanks removed. Therefore, items damaged during the cleanup must be covered under the Policy. H & M further argues the entire location must be in compliance with Michigan environmental regulations, not only the area contaminated by the release. Thus, these Unpaid Costs are necessary cleanup costs under the Policy for public safety. Zurich argues these costs are unnecessary in order to clean up the contaminated area. Alternatively, even if they can be construed as necessary, they are explicitly preempted by Exclusion L.

Section VIII.F of the Policy contains a choice of law clause that New York law apply to the issue of contract interpretation. New York courts look to the specific language of the insurance policy to determine the rights and obligations of the parties. See State of New York v. Home Indem. Co., 66 N.Y.2d 669, 670 (1985). Unambiguous provisions are given their plain and ordinary meaning, and ambiguous provisions must be resolved against the drafter. See Demopoulous v. New York Cent. Mut. Fire Ins. Co., 280 A.D.2d 855, 856 (N.Y. App. Div. 2001); Matter of Mostow v. State Farm Ins. Cos., 88 N.Y.2d 321, 326 (1996). "The test for determining whether an insurance provision is ambiguous 'focuses on the reasonable expectations of the average insured

5

upon reading the policy.'" Butler v. New York Cent. Mut. Fire Ins. Co., 274 A.D.2d 924, 925-26 (N.Y. App. Div. 2000).

### A.     Metro Tank, Inc. Invoice

The Metro Tank invoice charged $29,000 for supplying and installing new product lines and dispenser boxers, $9,500 for installing electrical wire and conduits for parts that were damaged during the excavation, $6,800 for reinstalling sewer system damaged during the excavation, $4,900 for installing three new islands and bumper guards, and $2,250 for backfilling stone over the product lines as required by MDEQ. (Doc. 18 Ex. G).  Zurich paid the $2,250 assessed for backfill, but denied the rest of the costs because they related to site enhancement, not remediation of soil and groundwater contamination required under Michigan regulations.

H & M argues that because MDNR rules require actions necessary to prevent or mitigate injury to the public health, it follows that these are necessary remedial costs. See M.C.L.A. § 324.21302(h).  In support, it relies on RCO Engineering, Inc. v. ACR Industries, Inc., 633 N.W.2d 449 (Mich. Ct. App. 2001).  H & M's reliance is misplaced. RCO involved a subsequent purchaser of land demanding remediation costs from the seller for contamination.  Id. at 452.  No insurance policy was involved, and the case merely focused on what remedial action the landowner must take to comply with Michigan law.  Here, the parties freely contracted as to which costs would be covered by Zurich in the event of a release.  At issue in this case is what costs Zurich agreed to cover for remediation of the contaminated area, not what additional collateral steps H & M is required to take to bring its entire premises (pumps and parking lot) in compliance

with Michigan regulations. The former depends on the Policy; the latter on additional MDNR regulations.

A clear reading the plain language of the Policy indicates Zurich was not required to pay for the services associated with updating and repairing the storage tank systems and dispenser islands. There is no ambiguity in the language regarding "cleanup costs." Zurich assumed the costs for cleaning up the soil and groundwater to bring its quality up to standards required by governmental regulations. Zurich satisfied this obligation when MDEQ issued a "closed" designation to the site. It appears as if the services invoiced may be "necessary" in remediating the contaminated area because excavation of the site was required to treat the surrounding affected area. Inevitably, items on the surface of the location required removal in order to remediate the contamination. Although they may be necessary in order to effectuate remediation, these costs are explicitly excluded in Section IV.L of the Policy.

The services provided by Metro Tank involved replacing damaged parts, updating existing parts, and installing new parts to the storage tank system. The Policy excluded any costs associated with reconstruction, repair, removal, maintenance, replacement, upgrading, or rebuilding of any scheduled storage tank system. The storage tank system includes "any connected piping, ancillary equipment and containment system that is on, within, or under a 'scheduled location.'" (Doc. 18 Ex. A, at § II.R). Reading these provisions in conjunction with Exclusion L, it is clear Zurich is not liable for costs associated with replacing the gasoline pumps, rebuilding the canopy, and replacing ancillary equipment required for the functioning of the storage tank systems. In addition, other courts have concluded Exclusion L of the same Policy

7

"refer[s] to the permanent rebuilding of the insured's property." See Mears Transp. Grp., Inc. v. Zurich Am. Ins. Co., 660 F. Supp. 2d 1297, 1306 (M. D. Fla. 2009).

Reading the plain language of the Policy indicates that H&M could never have reasonably expected Zurich to replace and update the storage tank system. See Butler, 274 A.D.2d at 925-26. Zurich was required to remediate the surrounding environmental area, not update and replace H & M's business equipment. A requirement that Zurich repair and replace the dispenser islands, recalibrate the dispenser islands, reinstall all of the electrical components of the system, and installing a new sewer system is unreasonable and excluded by the Policy language.

### B. Patrick Johnson, Inc. Invoice

Similarly, the services provided by Patrick Johnson, Inc. in replacing 5800 square feet of excavated concrete do not qualify as cleanup costs under the Policy. Plaintiff argues they are necessary because "[i]t is part of the necessary expense to put the excavated site back together after the removal of the contaminated soil." (Doc. 20 at 8). Plaintiff's argument is unpersuasive.

The Policy explicitly covers "cleanup costs" associated with the contaminated area. Zurich's responsibility was to restore the surrounding soil, groundwater, etc., that was contaminated to comply with Michigan regulatory standards. Zurich did not undertake to restore the entire site. The Policy unambiguously excluded coverage for costs associated with restoring the entire premises back to its original condition. Moreover, the Policy also excluded "any costs, charges or expenses incurred by the insured to confirm the existence of a 'release.'" (Doc. 18 Ex. A, p. 2 of 9). Although

these costs may have been "necessary" to locate and remove the contamination, the Policy explicitly excludes such costs.

## IV. CONCLUSION

In sum, H & M provided no evidence or authority supporting its contention that these services are required to remediate contamination of the surrounding environment. The Policy unambiguously excludes such services. There is also no evidence that H & M contracted for these additional services when negotiating the insurance agreement with Zurich. Therefore, H & M could not have reasonably expected the Policy covered the invoices and summary judgment is appropriate.

Accordingly, Defendant's Motion for Summary Judgment is **GRANTED**.

**IT IS SO ORDERED**.

s/Marianne O. Battani
MARIANNE O. BATTANI
UNITED STATES DISTRICT JUDGE

DATE: November 15, 2012

## CERTIFICATE OF SERVICE

I hereby certify that on the above date a copy of this Opinion and Order was served upon all parties of record via the Court's ECF Filing System.

s/Bernadette M. Thebolt

Case Manager